The first case that we have for argument today, I think, is United States v. Serr, docket 19-1197. Mr. Bornstein. Ready to hear your argument when you're ready to deliver. Thank you. May it please the court. Mr. Farley, my name is Peter Bornstein. I represent the court below for Mr. Serr in the court below. If I can watch the clock carefully, I'd like to stop enough time that I can leave some time for my rebuttal. I want to begin with discussion of conspiracy law and count one of the indictment. And then I would like to spend some time on count two, which is the issue about chain of custody. This case is different from most conspiracy cases because of the testimony of the principal prosecution witness, Christine Fitzgerald. Her testimony was a window into the actual conspiracy agreement that was the basis of the conspiracy count in this case. Her testimony was not only not contradicted by any other witness, her argued strenuously that she was credible in light of the fact that the co-defendant in the case who I had to try this case with was arguing that she was not credible. With respect to conspiracy law, this the basis for the conspiracy, especially in an illegal substance or drug case, is the agreement. Early, all of the major early conspiracy cases talk about the agreement. The agreement is the gravamen of the offense. And in drug cases there's no overt act. So really the agreement is the criminal act. That is what creates it. Do you contest that, in fact, Mr. Sir, was in a conspiracy, even if it was just in the days before and up to the day that he was caught with the pound of methamphetamine? No. We agree that he was part of some conspiracy, but an uncharged conspiracy that existed in 2016 ending when he was arrested and prosecuted in Kansas, yes. When you say uncharged, the conspiracy that you and I are describing, the smaller conspiracy, that's within the terms of the indictment, isn't it? The dates of the indictment? Within the dates of the indictment, but not within the terms of the indictment. The terms of the indictment, I would argue, I do argue, I not would, I do, I do argue that the terms of the indictment is the overarching conspiracy that lasted all the way into May of 2018. That is the issue really in this case, is that when the government chooses to go to the grand jury and ask the grand jury for an overarching indictment, they make a tactical, key tactical decision. In many cases, the defense can't deal with that, argue that, because we don't have somebody like Christine Fitzgerald, whose testimony actually establishes the parameters of what is in the agreement and the fact that there were at least three separate agreements. The basic law... Why weren't, why don't we have plenty of circumstantial evidence that those three separate agreements were interrelated or were part of one overarching conspiracy? Because the facts don't establish that. For example... We've got the same group of participants with the same objective, selling methamphetamine across state lines. Ultimately, we've got your client arrested on Zuarte Suarez's porch, which is, she was kind of the leader of the, or one of the leaders of the conspiracy. He lived in the same neighborhood that he clearly had significant contacts with these folks. Why can't we put this all together? Because the evidence doesn't establish that, Judge. The evidence, for example, is broken in the middle, when the, quote, object of the conspiracy to sell drugs turns into a robbery. That one fact alone breaks the chain of... Well, the robbery related to a plan to sell drugs to the person that's eventually robbed. Well, now let's go back... I mean, it's all related to the drugs, right? She had the money, the person who was robbed and assaulted had the cash because she thought she was going to be purchasing the drugs. That's correct. I agree. But it's not the same group of people decided to instead rob her of that money. Well, it's not quite the same group of people because my client was not part of that group. And I would urge this Court, in terms of looking at the record, that there is not circumstantial evidence that, for example, that the reason he was at the house at the time they went there to look for drugs following the May arrest, that he was somehow part of this group. That is not the evidence in the case. He's arrested originally in October of 2016 for transporting. He's a mule, basically, for this group. All that was established is that he was a mule for a transaction involving one member of the group. There was no evidence that there was a group at that point in time. Excuse me a minute. Sorry. Is it your position to be part of the overarching conspiracy and properly found guilty of that? There has to be evidence that he was involved in every single episode, every single agreement or transportation of drugs? No. I understand conspiracy law. I understand the case law in this case. I don't say that he has to be that. What would suffice for you, then? What would suffice for me would be, number one, that Christina Fitzgerald did not testify that there were three separate agreements. That's why I keep wanting to go back to first principles. That's what I thought I'd just ask you. I thought you were saying that Ms. Fitzgerald didn't identify him in these other transactions, so therefore he can't be part of an overarching conspiracy. I'm just trying to figure out your position. My position is that Fitzgerald described three separate agreements to buy drugs that were not interdependent and not linked in any way. And that was direct testimony, and it was not contradicted. And all of the, quote, circumstantial evidence that's normally brought forth in a conspiracy case to show what the agreement was is did not hurt her credibility or hurt the fact that there's direct evidence of the nature, scope, and participants in the agreement. That's the key to my argument. I'm not saying that you can't use all of that circumstantial evidence in cases where you don't know what the parameters of the agreement is or where nobody testifies to it. This case is somewhat unique on the facts because of the presence of the testimony of one of the conspirators to the nature of the conspiracy. The other point, Phillips, that I, in terms of where my position is, is totally based on the language of the Tenth Circuit Pattern Instruction 2-2-0. And I'm sure the court has seen 2-2-0, but it says clearly, if you find that the defendant was not a member of the conspiracy charged, then you must find the defendant not guilty, even though the defendant may have been a member of some other conspiracy. This is because proof that a defendant was a member of some other conspiracy is not enough to convict. So there is proof that he was part of some other conspiracy. And I would say that... And the jury rejected that. The jury was instructed properly. You're not challenging the jury instructions. They understood they had the option to find that he was a member of some other conspiracy, that these conspiracies weren't interrelated, and they rejected that. Well, my position is, yes, the jury was instructed with that instruction. But even though we give great deference to jury verdicts, juries are not infallible. Juries fail to follow instructions, rarely, but sometimes. Juries make mistakes, rarely, but sometimes. And appellate courts traditionally look to whether or not a jury can make a mistake. So, for example, in the spillover cases, we look at whether or not because of the evidence that was admitted against somebody that was not part of the conspiracy or part of some other conspiracy, whether that spilled over to such a degree that it would taint the jury's verdict. So, yes, the jury was properly instructed, but the only way I can explain how the jury came to its conclusion based on the overwhelming evidence in the case is that they didn't follow the instruction because of all of the evidence of the robbery, the evidence about this chase through Bennett, Colorado, with drugs flying out the window, which took up a majority of the trial days. Let me go to count two for a minute, if I have any time left. You're running down, so I won't interrupt you. Go ahead. I just want to say, once again, the issue about the jury has to do with the fact that the evidence in the case did not show a chain of custody. Now, normally, I agree, chain of custody relates to weight, not admissibility. Chain of custody relates to credibility, finding a fact of a jury. This case, again, is somewhat unique on the facts because no reasonable jury could find that the government actually proved that the evidence that was Exhibit 7, examined by the chemist in California, was the examination of the same drug seized in 2016 in Kansas and was tried to be sent to California. So the similarity in the weights, doesn't that matter? Because that's not the exact number, I don't think you can say similarity in the weights. We have that kind of similarity in approximately a pound in hundreds of drug cases. Is it 4 grams or so? And is that an amount that was tested? I believe it was 370 or 380. I'm talking about the difference. I think it was about 10 or 12 grams. I don't have that in front of me at the lectern. I think I'd better stop if I want any rebuttal. Thank you. Good morning, Mr. Borenstein. May it please the court. Paul Farley for the government. Judge Phillips, since you were talking about the chain of custody, I guess I'll start there and then back into the conspiracy. Here's what the jury heard. They heard that the methamphetamine was tested in Kansas with a weight of 433.5 grams. And that's at volume 5, pages 327 and 330. There's no dispute about the chain of custody from the point where it was retrieved from the defendant's vehicle all the way to being in the Kansas evidence locker at the point where it was requested by the DEA. Again, there's no dispute about how that occurred. That package was retrieved from the storage and sent the DEA in July 2018. On July 20th, Special Agent Campbell in Denver received it. That was a Friday. So he testified that he knew the lab didn't receive shipments over the weekend, so he secured it over the weekend. And then on Monday, he came in and sent it out. Now, he weighed it when he received it. The gross weight, inclusive of the packaging, was 480 grams. So the net weight was 433.5, as tested at the lab in Kansas. The gross weight with the packaging in Kansas was 480. So on Monday, July 23rd, Campbell shipped it to California. Now, Stephen Wing, the DEA forensic chemist who tested the contents, testified that an evidence specialist received the package in California on July 25th. So the jury heard, sent on the 23rd, received on the 25th. The name of that person was indicated on an accompanying form called a DEA-7. And he had reviewed that form before he came to testify. But not having the form in front of him at the time, he could not recall the person's name. So Wing testified that he weighed the entire parcel before he opened it. It was 479.9 grams. So it's a tenth of a gram different than the parcel that was weighed in Denver before it was sent to California. And the meth itself was 430.6 grams. So about three grams difference in the actual meth. So what did the jury hear? First they heard that there were standard procedures that were followed up one side and down the other. There was no intimation by anybody that they were sloppy, that they'd mishandled, that there was an attempt to tamper with the evidence. And that evidence left on July 23rd, received on July 25th. And we have the chemist's testimony about sort of the chain when it came into his office. What we don't have in the record is the name of the person at the front desk at the lab in California who received it. Why don't we? Generally when a defendant won't stipulate the chain of custody, that's a red flag that all the links need to be made. The record doesn't explain that. Your Honor, I'll be the first to tell you that having either the DEA 7 or the case detail report, which the chemist also testified on, we wouldn't even be talking about this. But the missing piece here is the name of the person who received it. An unforced error. In baseball terms, I think that's a good way of putting it. But there certainly was enough evidence here the jury could reasonably find that the chain was solid. And certainly if you look at the cases we cited in our brief, particularly the Lott case in the Seventh Circuit, in the Lott case, we didn't have testimony at all about, you know, the narcotics were here and they showed up here. And the Seventh Circuit found that was sufficient to at least sustain a finding that the chain was intact. So I think there was enough here. Is there anything else on chain of custody before I move? Okay. Thank you. As to the conspiracy, the conspiracy here involved the same core group of individuals whose roles remained similar throughout. And all three transactions were carried out in furtherance of a single criminal objective. Pause there, because that's where I have a question and a doubt. I understand the principle that once you're in a conspiracy, you're in until you get out. But when you assume that that first one, that Mr. Suhr is caught going 119 miles an hour with a pound of methamphetamine, that that's the same players as later in the game, why do you say that? Because he had been dispatched on that mission by Zarate Suarez, who is a common player, all the way through to deliver it to Carton and Fitzgerald, who were coming from Virginia and were supposed to meet him in Kansas City. And this conspiracy was, the objective was to traffic methamphetamine from Colorado to Virginia. So we had three principal players. Okay, so Zarate Suarez was the one who organized it, and then Roman was, I'm sorry, who was the one who finished out the transaction? And the next day, after the defendant was apprehended, then Roman Acevedo joined Zarate Suarez in meeting Carton and Fitzgerald to complete that transaction. So that's what I'm saying. We have the same players. Now, some come and go, and that doesn't violate principles of conspiracy law. What we had was the same objective with people with similar roles throughout in a variety of transactions. The success of a conspiracy doesn't rise or fall on any one particular member, and each one had to fulfill their role. That's why, after the defendant was apprehended, the remaining members completed that transaction. And that various combination of this group and others, because we have some unnamed co-conspirators that surface here and there, continued the Colorado to Virginia meth distribution conspiracy for another year and a half. And it's irrelevant whether one... Mr. Sur never appears again within any of those next two transactions. He does not appear in the next two transactions. In any way. No, nor does he need to. And in between, he's in prison for a while. Well, he's apprehended in October of 2016, and we know that he was back in Colorado, that he'd been released, apparently on supervision, by February of 2017. And that's the testimony of the probation officer in Colorado, which is towards the end of Volume 5. I don't have the exact page handy here. And so we know that because he'd applied for transfer of supervision from Kansas to Colorado. So he's back in Colorado in February of 2017. So we know he's around. We don't see him in the next two transactions. But what we do know is he never withdrew. He never communicated to the government or to his fellow co-conspirators that he was out. And he had an obligation to do that under the controlling law. And it was his burden to bring forth some sort of evidence in that respect, and he didn't. And can you describe for me the circumstances when he's eventually arrested? Because I think you attempt to connect those somehow to the conspiracy. Yeah. So on the third transaction, the one where Roman Acevedo, Fitzgerald, and Zuarte Suarez were finally all apprehended, the next day the DEA goes to Zuarte Suarez's home, which she shares with Gonzales Hernandez, their husband and wife. So they go to the home. Suarez is there at the house, sees the officers, and rushes inside. Now, do we have evidence that he actively participated? We do not, nor do we need it. Again, one thing that this court's authority in Delgado Uribe, which we cite in our brief, one of the things you will look at is the defendant's association with co-conspirators. That's how you pull that in. I was just wondering how you're pulling that in. I wasn't quite clear on that. It's a simple association. He's there the day after the arrest of the other two. He's at their home. At the home of the lead person and her husband, who is also, as Mr. Bornstein indicated, the subject of another appeal that's working its way. And so that's further indicia. But, again, what we have is no withdrawal. And I'm happy to talk about the Melton case if that's of some concern. The Melton case says that an arrest under certain circumstances amounts to a withdrawal. But first thing about Melton, it's a case about relevant conduct and sentencing guidelines. And in that, and I'll quote at page 1403 of the opinion, it quotes the commentary, the focus on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a conspirator. So the court held, and this would be at 1407, the district court misapplied the guidelines by equating the scope of criminal activity Mr. Melton agreed to undertake with the scope of the entire conspiracy. That's exactly what we have here. Now, in this case, there was no enhancement for any post-arrest conduct of the conspiracy with respect to Mr. Suhr's sentence. He didn't get an enhancement for the robbery. He didn't get an enhancement for any of the subsequent transactions. He was convicted of a conspiracy of which he was a part, which continued until it was finally defeated in 2018, and he never withdrew, and he never, and so that count obtains. I'm happy to talk about the robbery issue. I'm happy to talk about Ms. Fitzgerald's testimony. Why don't you address Ms. Fitzgerald because I think that seems to be the defendant's primary suggestion is that she testified to three separate transactions. She absolutely testified to separate transactions, but the fact that they're separate transactions doesn't mean they aren't part of one conspiracy. In both the opening brief and the reply brief, the defense talks about how she said there were separate conspiracies, and I'll just, we'll start at volume five, page 704. Question. So each time he contacted you, you and he entered into a new agreement, right? Yes, sir. That would be a new conspiracy, right? I guess so, sir. Page 719. During that 12 or 15 or 12 or 13 months, whatever the number is, you're no longer part of either of those two conspiracies, right? No, sir. So what we have is the word conspiracy never leaves that witness's mouth. It's being fed to her. Now, she's not a lawyer. She's not a juror. She hasn't been instructed on what a conspiracy is or isn't. And, in fact, at one point Judge Brimmer cautioned that this appears to be clearly a backdoor attempt to try and argue legal facts or make legal arguments to the jury. So her testimony as to the transactions, yeah, it is what it is, and I think it's compelling. The fact that she is getting a little flustered about what is a conspiracy versus a transaction. At one point, this is at page 727, she was asked, were you using that term in a legal sense or more of a colloquial conversation sense? And she said, I don't understand the question. So I don't find that that really tells us much about whether there was an overarching conspiracy. Had you just had the government simply charged the smaller conspiracy, the October 17, 2016 event, or even just the possession with intent to distribute on that day, would it still have been a 120-month mandatory minimum? Would have because it's ICE. I think the smaller conspiracy would have. And, of course, the jury was instructed in the alternative. The defense offered instruction, which is at page, volume 1, page 345, that said that if there was a conspiracy to distribute methamphetamine, that conspiracy began and ended in 2016 with the delivery of drugs to Christina Fitzgerald in October 2016. So the jury had the alternative. And, in fact, I think this could be sustained under either theory because, again, there was no sentencing enhancement. There was no additional penalty to him being convicted of the larger or the smaller conspiracy. No additional penalty because of the 10-year mandatory minimum, right? That is, I will say yes, but I guess I'd want to go back and double-check that. And I'd be happy to do a 28-J if I find out otherwise. I know the answer on that one. Okay. I have nothing further. Thank you. Before we unplug, thank you, Judge Moritz. Judge McKay, do you have any questions? It's kind of difficult for you being outside the courtroom. I'm listening, I'm hearing, and I've never been accused of being reticent about asking questions. All right. Thank you. Thank you. The issue about the chain of custody directly reflects the fact that if the chain of custody charge goes away because of failure of proof, then the 10-year maximum goes away, and it either becomes a 5-year minimum or, depending upon the amount, because it's less than 500 grams, no matter how you slice it, it could be a 0-20 sentence that would be the proper sentence in the case. I don't follow that. If the chain of custody, if you win on that, then there's no sentence, is there? The conviction is just undone. That's correct. But if we have a new trial, there could be an issue about what the purity of the drugs is again. But at least if there's a new trial. Fact. The house that Mr. Suhr was arrested at was the house of the mother of Zarate Suarez. She was living at that house.  And when Mr. Suhr was found there, it's only guilt by association that would say that the reason he was at that house is that he was part of some conspiracy. Knowing members of a conspiracy or simple presence is not sufficient evidence to establish that. I think I have no time left. But we will give Judge McKay the opportunity if he has any questions. No, I have no questions. All right. Thank you both for your helpful arguments. The case is submitted. Thank you. And counsel are excused.